IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

SUN CITY HOME OWNERS ASSOCIATION, *Appellant*,

*v.*

ARIZONA CORPORATION COMMISSION, *Appellee*,

EPCOR WATER ARIZONA, INC. and VERRADO COMMUNITY
ASSOCIATION INC., *Intervenors*.

No. 1 CA-CC 17-0002
FILED 1-23-2020

Appeal from the Arizona Corporation Commission
No. WS-01303A-16-0145

**AFFIRMED**

COUNSEL

Ellman Law Group, L.L.C., Phoenix
By Robert L. Ellman
*Counsel for Appellant*

Arizona Corporation Commission, Legal Division, Phoenix
By Andrew M. Kvesic, Mareen A. Scott, Naomi E. Davis,
Stephen Joseph Emedi
*Counsel for Appellee*

Lewis Roca Rothgerber Christie, L.L.P., Phoenix
By Thomas H. Campbell, Michael T. Hallam
*Counsel for Intervenor Epcor Water Arizona Inc.*

Law Office of Michele Van Quathem, P.L.L.C., Phoenix
By Michele Van Quathem
*Counsel for Intervenor Verrado Community Association Inc.*

---

**OPINION**

Presiding Judge Kenton D. Jones delivered the Opinion of the Court, in which Judge James B. Morse Jr.[1] joined. Judge Michael J. Brown dissented.

---

**J O N E S**, Judge:

**¶1**　　　The Sun City Home Owners Association (SCHOA) appeals Decision 76162 (the Decision) of the Arizona Corporation Commission (the Commission), which consolidated five separate wastewater districts operated by EPCOR Water Arizona, Inc. (EPCOR) and imposed an identical wastewater rate throughout the newly consolidated district. SCHOA, an intervenor in the rate case, argues the consolidated rate is unjust and discriminatory, and therefore violates the Arizona Constitution, and is unsupported by the evidence. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

**¶2**　　　EPCOR provides wastewater service to the Agua Fria, Anthem, Mohave, Sun City, and Sun City West wastewater districts. All except Mohave are located within the Phoenix metropolitan area; most are geographically distinct and served by separate wastewater treatment facilities. EPCOR's corporate service functions, including accounting and customer service, are centralized.

**¶3**　　　Historically, the Commission set individual rates for each district, and monthly wastewater rates have varied substantially, ranging from $22.11 per month in Sun City, to $71.16 per month in Agua Fria. The rates varied even between districts that use the same wastewater treatment facility; before consolidation, Sun City West customers paid $32.46 per month, while Agua Fria customers, some of whom were serviced from the same facilities, paid $71.16 per month. Ultimately, the customers paying

---

[1]　　　Judge Morse replaces the Honorable Jon W. Thompson, who passed away while this case was pending. Judge Morse has read the briefs, reviewed the record, and watched the recording of the June 7, 2018 oral argument.

higher rates in the Agua Fria, Anthem, and Mohave districts urged the Commission to impose a consolidated rate. *See* U.S. Envtl. Protection Agency & Nat'l Ass'n of Regulatory Utils. Comm'rs, EPA 816-R-99-009, *Consolidated Water Rates: Issues and Practices in Single-Tariff Pricing* vii (Sep. 1999), https://nepis.epa.gov/Exe/ZyPDF.cgi/200027XN.PDF?Dockey= 200027XN.PDF (defining a consolidated rate as "the use of a unified rate structure for multiple [waste]water . . . utility systems that are owned and operated by a single utility, but that may or may not be contiguous or physically interconnected").

¶4            In 2014, after several attempts to address the consolidation request, the Commission ordered EPCOR to file a rate application that included revenue requirements and cost-of-service studies for three different scenarios: (1) full consolidation of the five districts into a single "Arizona Wastewater" district; (2) the "stand-alone scenario," whereby the five districts would remain distinct; and (3) full deconsolidation, which would require separation into seven districts based upon the facility serving each area.

¶5            EPCOR filed the rate applications in April 2016.  In February 2017, the Commission held a six-day evidentiary hearing on the issue of consolidation.

¶6            EPCOR, the Commission Staff, and the Agua Fria, Anthem, and Mohave districts supported full consolidation.  The proponents argued consolidation would provide "predictable uniform rate structures, reduc[e] regulatory expenses, and increas[e] efficiencies."  They presented evidence that many of EPCOR's operational and administrative activities are centralized, and that EPCOR obtains capital and debt financing centrally. EPCOR estimated consolidation would save the utility almost $1 million over a five-year period, with most of the savings coming from the reduced number of rate cases filed with the Commission.  EPCOR also specifically noted that most of its wastewater pipes in the Sun City district were nearing the end of their useful life and would require approximately $57.4 million in improvements over the next ten years.

¶7            SCHOA and the Residential Utility Consumer Office (RUCO)[2] intervened and opposed full consolidation in favor of the stand-

_____

[2]      RUCO is the state agency "established to represent the interests of residential utility consumers in regulatory proceedings involving public

alone scenario, arguing the consolidated rate would not reflect the actual cost to provide services to Sun City residents. The opponents argued EPCOR relied too heavily upon speculative projections of Sun City's infrastructure costs and noted EPCOR had also projected spending more than $100 million in the other four wastewater districts over the same time period. None of the parties supported full deconsolidation.

¶8        In a 4-1 decision, the Commission approved full consolidation with a five-year phase-in that would affect consumer rates as follows:

| Full Consolidation (5-Year Phase-In) | | | | | | |
|---|---|---|---|---|---|---|
| District | Current Monthly Bill | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Agua Fria | $ 71.16 | $62.44 | $56.50 | $50.53 | $44.55 | $ 38.59 |
| Anthem | $ 60.33 | $59.15 | $55.39 | $51.63 | $47.89 | $ 38.59 |
| Mohave | $ 71.07 | $57.28 | $52.36 | $47.44 | $42.52 | $ 38.59 |
| Sun City | $ 22.11 | $27.13 | $29.74 | $32.36 | $34.98 | $ 38.59 |
| Sun City West | $ 32.46 | $37.59 | $37.59 | $37.59 | $37.59 | $ 38.59 |

SCHOA unsuccessfully applied for a rehearing, *see* A.R.S. § 40–253(A)[3] ("If the commission does not grant the application [for rehearing] within twenty days, it is deemed denied."), and SCHOA timely appealed. We have jurisdiction pursuant to A.R.S. § 40-254.01(A). On appeal, Verrado Community Association, Inc. and EPCOR were both permitted to intervene in support of the Commission's decision.

## DISCUSSION

### I.    Constitutionality of the Consolidated Rate

¶9        Arizona's longstanding public policy regarding monopolistic public service corporations, including wastewater companies, "is one of regulated monopoly over free-wheeling competition." *James P. Paul Water Co. v. Ariz. Corp. Comm'n*, 137 Ariz. 426, 429 (1983) (citing *Ariz. Corp. Comm'n v. People's Freight Line, Inc.*, 41 Ariz. 158, 165 (1932), and *Ariz. Corp. Comm'n v. Tucson Ins. & Bonding Agency*, 3 Ariz. App. 458, 463 (1966)). The Arizona Constitution grants the Commission "full power to . . . prescribe just and

service corporations before the corporation commission." Ariz. Rev. Stat. (A.R.S.) § 40-462(A).

[3]      Absent material changes from the relevant date, we cite the current version of rules and statutes.

reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the state for service rendered therein . . . ."  Ariz. Const. art. 15, § 3.  "'[J]ust and reasonable rates' are those that are fair to both consumers and public service corporations."  *Phelps Dodge Corp. v. Ariz. Elec. Power Coop., Inc.*, 207 Ariz. 95, 106, ¶ 30 (App. 2004) (citing *Ariz. Cmty. Action Ass'n v. Ariz. Corp. Comm'n*, 123 Ariz. 228, 231 (1979)).

¶10        "The general theory of utility regulation is that the total revenue, including income from rates and charges, should be sufficient to meet a utility's operating costs and to give the utility and its stockholders a reasonable rate of return on the utility's investment."  *Scates v. Ariz. Corp. Comm'n*, 118 Ariz. 531, 533-34 (App. 1978) (citing *Simms v. Round Valley Light & Power Co.*, 80 Ariz. 145, 153 (1956)).  When setting rates, the Commission first determines the revenue requirement by "finding the 'fair value' of a utility's in-state property, and then using that value as the 'rate base' in the following rate-of-return formula: (Rate Base x Rate of Return) + Expenses = Revenue Requirement."  *RUCO v. Ariz. Corp. Comm'n*, 240 Ariz. 108, 110, ¶ 6 (2016) (citing Ariz. Const. art. 15, § 14, and *US West Commc'ns, Inc. v. Ariz. Corp. Comm'n*, 201 Ariz. 242, 245, ¶ 13 (2001)).

¶11        Once the Commission has determined the revenue requirement, it must then apportion the revenue requirement among the various consumer classes.  *See Freeport Minerals Corp. v. Ariz. Corp. Comm'n*, 244 Ariz. 409, 411, ¶ 8 (App. 2018).  Few Arizona cases discuss what factors the Commission should consider when apportioning the revenue requirement, but the Commission readily acknowledges that "cost causation principles are fundamental to rate design."  Other states' courts agree "that a cost-of-service study is of paramount importance and may indeed be a precondition to consideration of a proposed rate design." *United States v. Pub. Utils. Comm'n* (*Newport Elec.*), 393 A.2d 1092, 1096 (R.I. 1978) (collecting cases); *cf.* James C. Bonbright, *Principles of Public Utility Rates* 67 (1961), https://www.raponline.org/knowledgecenter/principles-of-public-utility-rates/ ("Rates found to be far in excess of cost are at least highly vulnerable to a charge of 'unreasonableness.'").  Accordingly, the Commission requires cost-of-service studies as part of any rate application.

¶12        The cost of service, however, is but one aspect of setting rates. *See Freeport*, 244 Ariz. at 414-15, ¶ 20 (concluding that a rate design may be constitutional even if it "deviate[s] from strict cost of service"); *see also In re Permian Basin Area Rate Cases*, 390 U.S. 747, 776-77 (1968) ("[R]ate-making agencies are not bound to the service of any single regulatory formula; they are permitted, unless their statutory authority otherwise plainly indicates,

to make the pragmatic adjustments which may be called for by particular circumstances.") (quotation omitted). The Commission retains broad discretion in determining the weight to assign the cost-of-service studies and may also consider "economic, social, historical and other factors that may affect customers," which "often result[s] in rates that deviate from strict cost of service." *Freeport*, 244 Ariz. at 412, ¶ 10; *see also Miller v. Ariz. Corp. Comm'n*, 227 Ariz. 21, 28, ¶ 30 (App. 2011) (noting the Commission may look at "more than 'setting a fair return on a predetermined value'") (quoting *Ariz. Corp. Comm'n v. State ex rel. Woods*, 171 Ariz. 286, 296 (1992)).

¶13 SCHOA argues the consolidated rate adopted within the Decision violates the Commission's constitutional obligation to set "just and reasonable rates," because it is not based upon "the bedrock rate-making principle of cost-causation" and unfairly prejudices Sun City customers. We review *de novo* whether a Commission decision runs afoul of the Arizona Constitution. *RUCO*, 240 Ariz. at 111, ¶ 10 (citing *US West*, 201 Ariz. at 244, ¶ 7).[4] But "[b]ecause ratemaking is a function specifically entrusted to the Commission by the Arizona Constitution, a stringent standard of review applies: 'We generally presume the Commission's actions are constitutional, and we uphold them unless they are arbitrary or an abuse of discretion.'" *Freeport*, 244 Ariz. at 411, ¶ 6 (quoting *RUCO*, 240 Ariz. at 111, ¶ 10). Although we are sympathetic to the dissent's reservations regarding the origins of this extreme deference, we are "bound by the decisions of our supreme court and must apply the law it has declared." *Austin v. Austin*, 237 Ariz. 201, 208, ¶ 21 (App. 2015) (citing *Bazzanella v. Tucson City Court*, 195 Ariz. 372, 376, ¶ 8 (App. 1999)). Thus, we remain mindful of the extreme deference our supreme court has traditionally granted to the Commission's ratemaking authority. *See State v. Tucson Gas, Elec. Light & Power Co.*, 15 Ariz. 294, 306 (1914) ("While it is not so named, [the Commission] is, in fact, another department of government, with powers and duties as well defined as any branch of the

---

[4] We reject SCHOA's suggestion that our analysis begins with strict scrutiny review. This Court will apply strict scrutiny to determine whether a law which "'substantially burdens fundamental rights' or makes distinctions based on certain suspect classes" passes constitutional muster. *See, e.g.*, *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n*, 211 Ariz. 337, 345, ¶ 18 (App. 2005) (quoting *Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003)). This analysis is premised upon the existence of a substantial burden, *id.* (explaining when different standards of review are applied — after differential treatment is identified), which, as detailed in ¶¶ 22-23, *infra*, is not the case here.

government, and where it is given exclusive power it is supreme. Its exclusive field may not be invaded by either the courts, the legislative, or executive."); *see also Ethington v. Wright,* 66 Ariz. 382, 392 (1948) ("[I]n the matter of prescribing classifications, rates, and charges of public service corporations . . . the Corporation Commission has full and exclusive power."); *US West*, 201 Ariz. at 246, ¶ 21 ("The commission has broad discretion . . . to determine the weight to be given [the fair value of services] in any particular case.").

¶14            In our review, we will accept the Commission's factual findings so long as they are supported by substantial evidence. *Simms*, 80 Ariz. at 154 (citations omitted). If we determine the Decision is constitutional, we will uphold it unless the opponent demonstrates, "clearly and convincingly, that the Commission's decision is arbitrary, unlawful or unsupported by substantial evidence." *Freeport*, 244 Ariz. at 411, ¶ 6 (quoting *Litchfield Park Serv. Co. v. Ariz. Corp. Comm'n*, 178 Ariz. 431, 434 (App. 1994)); *see also* A.R.S. § 40-254.01(E) ("In all appeals that are taken pursuant to this section, the party adverse to the commission or seeking to vacate or set aside an order of the commission must make a clear and satisfactory showing that the order is unlawful or unreasonable.").

### A.      The Commission Considered Cost-Causation Evidence.

¶15            SCHOA acknowledges the Commission is not strictly bound by the cost of service, but argues the Commission failed to even consider the cost of service before consolidating the districts here. The record does not support this claim.

¶16            The record reflects that EPCOR provided cost-of-service studies for the full consolidation, stand-alone, and full deconsolidation scenarios, as required by the Commission's order and administrative rules. *See* Ariz. Admin. Code (A.A.C.) R14-2-103(B)(1)(G). The studies were not opposed, challenged, or otherwise refuted by any participant and the Commission Staff found the studies were "performed consistently with the methodology generally accepted in the industry and that the allocation factors used had been developed appropriately."

¶17            Additionally, the Decision reflects the Commission carefully considered the cost-of-service studies for each proposed scenario. The Commission cites information from the cost-of-service studies regarding the projected savings to all consumers from a decrease in the number of rate

7

applications[5] under the full consolidation scenario. The Commission also found that full consolidation would specifically benefit Sun City customers, noting that "[e]ach $1 million capital investment made in Sun City would raise a Sun City customer's monthly bill approximately $0.60 under the stand-alone scenario or approximately $0.25 under full consolidation."

¶18 SCHOA relies on one paragraph of the Commission's two-hundred-page Decision to suggest the Commission "redefined cost causation in a way that effectively removed it from consideration" and "free[d] itself from the shackles of geography and 'traditional' cost causation." In that paragraph, the Commission stated:

> It is true that under traditional cost-causation ratemaking, as applied to date for EPCOR's wastewater operations, the costs attributable to any particular customer class have been considered only within the confines of a specific geographically defined wastewater district. . . . [H]owever, . . . cost-causation does not need to be viewed in such a narrow manner based on geography but can instead be considered for customer classes that span across all geographic areas in which EPCOR has wastewater operations. Thus, full consolidation, . . . would not necessitate repudiation of cost-causation principles if all of EPCOR's wastewater systems are viewed as one unit with one set of customers who get broken up into classes not constrained by geography.

However, SCHOA cites no authority requiring the Commission to limit its evaluation of the cost of service by geography. Nor is any such restriction found within Arizona's Constitution. Accordingly, SCHOA fails to prove the Commission violated the Arizona Constitution based upon the weight assigned to the cost-of-service evidence.

### B. The Consolidated Rate is Not Discriminatory.

¶19 SCHOA argues the consolidated rate discriminates against Sun City customers in violation of the Arizona Constitution and A.R.S. § 40-

---

[5] The Commission determines rate changes through a proceeding called a "rate case." *See generally* A.A.C. R14-2-103. Rate cases are long, expensive, and complicated, often involving multiple intervening parties, thousands of public comments, detailed reports from experts, and multiple hearings. *See RUCO*, 240 Ariz. at 110, ¶ 6.

334. The Arizona Constitution indeed prohibits the Commission from "discrimination in charges, service, or facilities . . . between persons or places for rendering a like and contemporaneous service." Ariz. Const. art. 15, § 12. Thus, in cases involving "like and contemporaneous service," rate parity is not only encouraged, but constitutionally required.[6] By statute, Arizona likewise prohibits public service corporations from discriminating in "rates, charges, service, facilities or in any other respect, mak[ing] or grant[ing] any preference or advantage to any person or subject[ing] any person to any prejudice or disadvantage," or "establish[ing] or maintain[ing] any unreasonable difference as to rates, charges, service, facilities or in any other respect, either between localities or between classes of service." A.R.S. § 40-334(A)-(B).

**¶20**       Unlike the traditional rate discrimination case, where it is alleged a utility treats similarly situated customers differently, SCHOA's argument is premised upon its assertion that Sun City customers would be charged the same rate as other consumers but receive lower-cost services, effectively subsidizing wastewater services in other, geographically distinct areas. Taken to its logical conclusion, SCHOA's argument would require different rates for each customer if there is any discrepancy in the cost of providing service. We do not interpret the constitutional prohibition on "discrimination in charges, services, or facilities . . . between persons or places" as mandating different charges based on location. But even assuming this novel reverse-rate-discrimination theory could provide a basis for relief, SCHOA can only prevail if it establishes as error in the Commission's finding that customers across the newly consolidated district receive "like and contemporaneous services." Although we review constitutional claims *de novo*, we are bound by the Commission's underlying factual findings if supported by substantial evidence. *See supra* ¶¶ 13-14.

**¶21**       SCHOA's argument focuses on evidence of dissimilarities between Sun City and the other districts that suggest consolidation is inappropriate. But we do not reweigh evidence; if a conflict exists, "it is the Commission's constitutional responsibility, when engaged in its ratemaking power, to view conflicting evidence and make determinations accordingly." *Sierra Club − Grand Canyon Chapter v. Ariz. Corp. Comm'n*, 237 Ariz. 568, 576, ¶ 26 (App. 2015); *see also DeGroot v. Ariz. Racing Comm'n*, 141 Ariz. 331, 336 (App. 1984) ("If two inconsistent factual conclusions

---

[6]       An exception, not applicable here, exists for "the granting of free or reduced rate transportation" to qualifying classes of consumers. Ariz. Const. art. 15, § 12.

could be supported by the record, then there is substantial evidence to support an administrative decision that elects either conclusion.") (quoting *Webster v. State Bd. of Regents*, 123 Ariz. 363, 365-66 (App. 1979)) (citation omitted); *Moore v. Title Ins. Co. of Minn.*, 148 Ariz. 408, 413 (App. 1985) (concluding substantial evidence may support a factual finding "even though there might be substantial conflicting evidence") (citing *Lewis v. Midway Lumber, Inc.*, 114 Ariz. 426, 429 (App. 1977)).

¶22    The Commission resolved conflicting evidence in favor of finding that the customers within the consolidated district receive like and contemporaneous wastewater services.  This determination is supported by the record, which contains evidence that all EPCOR customers receive the "same exact service . . . the same customer service, . . . the same billing systems, . . . [and] the same operations teams" and that the costs for operation, maintenance, and administrative tasks are "relatively the same" across the districts.  Additionally, many of EPCOR's operational and administrative activities are centralized, and EPCOR obtains capital and debt financing centrally.  The districts also share maintenance personnel, who are deployed as needed.  Although there was evidence that the treatment costs were "a bit higher" in Anthem because its treatment facility uses a different technology, its maintenance costs are lower.  Additionally, although the cost-of-service studies reflected variation between the districts under the stand-alone scenario, these differences largely resulted from the timing of capital investments, rather than the day-to-day costs of administration, treatment, and maintenance.

¶23    Because SCHOA has shown no error in the Commission's finding that all customers are charged the same rate for the same services, SCHOA fails to prove the Commission set a discriminatory rate in violation of the Arizona Constitution or A.R.S. § 40-334.

## II.    Other Challenges to the Consolidated Rate

¶24    SCHOA argues the Commission acted arbitrarily and capriciously in adopting the consolidated rate.  "An agency acts arbitrarily and capriciously when it does not examine 'the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Compassionate Care Dispensary, Inc. v. Ariz. Dep't of Health Servs.*, 244 Ariz. 205, 213, ¶ 25 (App. 2018) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).  An action is not arbitrary and capricious if there is "room for two opinions," so long as it is "exercised honestly and upon due consideration."  *Id.* at 214, ¶ 29 (quoting *Petras v. Ariz. State Liquor Bd.*, 129

Ariz. 449, 452 (App. 1981)). And again, "[b]ecause ratemaking is such a complex and specialized endeavor," we accord substantial deference to the Commission's analysis. *Miller*, 227 Ariz. at 28, ¶ 27 (citing *Woods*, 171 Ariz. at 294).

### A. The Decision to Adopt a Consolidated Rate is Supported by Substantial Evidence and Rational Explanation.

**¶25** SCHOA first complains the Commission acted arbitrarily and capriciously by: (1) failing to adequately explain why it looked beyond cost-causation evidence, and (2) rejecting or failing to consider the merits of SCHOA's discrimination claim. We disagree.

**¶26** As detailed above, substantial evidence supports the Commission's determination that all consumers within the consolidated district receive similar services from EPCOR. *See supra* ¶¶ 22-23. Moreover, the Decision contains a detailed explanation of how the Commission considered cost-causation principles under the different scenarios, why avoiding rate shock was a higher priority than staying with a strict cost-causation rate design, and why the Commission decided not to base rates upon geographic or demographic features of the districts. The Commission also explained that it was not, and had never been, bound by the districts' geographical properties; indeed, two of the then-existing districts at issue here — Agua Fria and Mohave — were comprised of two distinct land areas served by separate facilities. Thus, although the scale of this consolidation was much larger than previous proposals, the Commission's decision to consolidate was not without precedent or the result of an abrupt policy change.

**¶27** SCHOA fails to prove the consolidated rate resulted from the Commission's failure to adequately consider arguments or explain its decision. Rather, the Commission's observations and explanations within the Decision reflect careful consideration and conscientious rejection of SCHOA's arguments.

### B. The Commission Gave the Evidence Due Consideration.

**¶28** SCHOA argues the Commission acted arbitrarily and capriciously when it "failed or refused to meaningfully consider" public comments in opposition to consolidation and an Arizona State University (ASU) report that found Sun City residents have fewer resources and lower income than residents of other districts. In a separate but related argument, SCHOA contends that "the fact that the Commission thoroughly recited the

parties' and witnesses' respective positions does not mean the Commission *treated* them as relevant or valid or weighed them." We again disagree.

**¶29** The record does not support SCHOA's claim that the Commission ignored consumer interests. *See Phelps Dodge*, 207 Ariz. at 107, ¶¶ 30-31 ("[b]earing in mind the Commission's duty to consider the interests of 'all whose interests are involved' in setting just and reasonable rates," including consumer interests). Consumers were well-represented through the intervening parties. These parties, including SCHOA and RUCO, were given ample opportunity to, and did, advance the interests of various consumer groups during the course of the proceedings. And although the record reflects that the Commission treated public comment differently than sworn evidence, it acted within its discretion to do so. *Cf. Leslie C. v. Maricopa Cty. Juv. Court*, 193 Ariz. 134, 136 (App. 1997) (concluding the factfinder "must weigh evidence independently from the conclusions of witnesses" and acted within its discretion in assigning a greater weight to certain evidence "than did the witnesses") (citing *Callender v. Transpacific Hotel Corp.*, 179 Ariz. 557, 562 (App. 1993), and *State Farm Fire & Cas. Co. v. Brown*, 183 Ariz. 518, 525-26 (App. 1995)).

**¶30** Finally, the record reflects the Commission considered and rejected the ASU report, ultimately finding "the demographic and economic information provided [to be] of limited utility in deciding the consolidation issue" because "relative community affluence does not present a valid basis for establishing the justness and reasonableness of rates." SCHOA argues the "rationale for discounting this evidence is not persuasive," but we, again, defer to the weight the Commission assigned the evidence. *See Sierra Club*, 237 Ariz. at 576, ¶ 26 (deferring to the Commission's reliance on evidence even after the opponent of the rate claimed the decision "was based on speculative evidence that 'defied credibility'"); *Simms*, 80 Ariz. at 146 ("The commission is entitled to reasonably determine the probative force of [relevant evidence].") (citing *R.R. Comm'n of Cal. v. Pac. Gas & Elec. Co.*, 302 U.S. 388, 397-98 (1938)).

**¶31** The record clearly demonstrates the Commission considered all the evidence, identified what it deemed relevant, and weighed the competing rate designs. The fact that the Commission assigned less weight to or rejected certain evidence does not render the Decision arbitrary. To the contrary, the resolution of conflicts in the evidence is an essential part of the Commission's ratemaking function. *See Sierra Club*, 237 Ariz. at 576, ¶ 26. SCHOA simply invites this Court to reweigh the evidence — a task in which we will not engage. *See Freeport*, 244 Ariz. at 417, ¶ 34 ("We are

not empowered to substitute our judgment of what we may find to be an optimal rate structure for the Commission's.").

### C. The Commission Properly Considered Projected Future Expenses.

¶32 SCHOA argues the Commission acted arbitrarily and capriciously when it considered the Sun City district's projected future expenses as part of its consolidation analysis. Without citation to authority, SCHOA argues "[a]nticipating costs five to ten years into the future is illegitimate in a rate making process that creates a revenue requirement based on *historic* costs in an expired test year, augmentable only under strict criteria that do not include distant eventualities."

¶33 In the limited context of a fair-value determination, our supreme court has held that "the Commission in its discretion can consider matters subsequent to the historic year, bearing in mind that all parties are entitled to a reasonable opportunity to rebut evidence presented." *Ariz. Corp. Comm'n v. Ariz. Pub. Serv. Co.*, 113 Ariz. 368, 371 (1976). Although *Arizona Public Service* only addressed the inclusion of "projects contracted for and commenced during the historical year" in the fair-value determination, *see id.*, the principle can apply more broadly to the Commission's policy decision to assign greater weight to principles such as gradualism or avoiding rate shock. *See Freeport*, 244 Ariz. at 414-15, ¶ 20 (concluding that "rate shock is a well-founded concern . . . when establishing a revenue allocation scheme that is just and reasonable"). The projected future expenses were relevant to the Commission's stated policy decision to gradually increase rates and avoid rate shock through consolidation here, and the Commission did not err in considering the future cost of service for this purpose. Moreover, all parties had ample opportunity to rebut the evidence at the evidentiary hearing, and several attempted to do so. On this record, SCHOA has shown no error.

### CONCLUSION

¶34 The Decision is affirmed.

**B R O W N**, Judge, dissenting:

¶35 The majority errs by giving virtually absolute deference to the Commission's groundbreaking decision to approve EPCOR's application to consolidate five dissimilar sewer districts and adopt the same rate for each district. Even though our Constitution and statutes prohibit the imposition of discriminatory charges or rates, the Commission never determined whether this new consolidated rate design discriminates among groups of customers who are quite dissimilar, other than they now share a common owner. Not only did the Commission fail to resolve the discrimination issue, plainly raised by SCHOA, it washed its hands of any responsibility to address it.

¶36 Despite this gaping hole in the Commission's ruling, the majority pushes the highly deferential treatment afforded the Commission for more than a century even further by concluding that EPCOR's new rates run afoul of neither Article 15, § 12 of the Constitution ("anti-discrimination clause") or § 40-334(A). The majority summarily holds that rates are not discriminatory under our statutes and Constitution whenever the Commission resolves conflicting evidence to conclude that customers receive "like and contemporaneous service." Yet the Commission itself offered no explanation why a uniform rate does not impose a discriminatory charge on residents when the cost to serve those residents differs drastically. Nor did the Commission even attempt to explain how the uniform rate does not subject Sun City customers to prejudice or disadvantage under § 40-334(A). The majority concludes nonetheless that the decision to force SCHOA to subsidize four other sewer districts through consolidation was not arbitrary and is supported by substantial evidence.

¶37 I cannot agree with these broad conclusions, particularly considering the Commission's complete failure to address whether consolidation violates the anti-discrimination clause or § 40-334(A). Given the importance of the Commission's role in our state government, Arizonans deserve a thorough constitutional and statutory analysis of this newly minted policy. I would therefore remand the matter to the Commission with an instruction to squarely address the discrimination issues raised by SCHOA. *See* A.R.S. § 40–254.01(A) (granting this court the power to remand an order of the Commission "upon a clear and satisfactory showing that the order is unlawful or unreasonable").

### A.    Standard of Review:  What is the Court's Role?

¶38 I must first address the fundamental problem underlying much of the majority's analysis—excessive deference. For decades, both

this court and our supreme court have repeated broad pronouncements suggesting that Commission decisions, especially in rate cases, are essentially untouchable. Those statements stem from the perception that the judiciary has an extremely narrow role in these types of cases. That perception is not necessarily wrong, especially when the Commission resolves highly technical matters within its expertise. I believe our supreme court should clarify, however, our proper function in reviewing complex legal issues like discrimination so that the judicial branch may continue to ensure that the Commission follows its constitutional and statutory obligations. Otherwise, one may fairly question why we are even asked to review these types of cases, with all their complexities, when the outcome is essentially predetermined.

¶39        The majority correctly notes that we are not free to disregard controlling authority of our supreme court. As explained below, however, some of the authority commonly cited for the extraordinary deference given to the Commission has its origins in dicta, and flawed dicta at that. *See Town of Chino Valley v. City of Prescott*, 131 Ariz. 78, 81 (1981) ("Dictum thrice repeated is still dictum. It is a court's statement on a question not necessarily involved in the case and, hence, is without force of adjudication. . . . It is not controlling as precedent.").

¶40        The majority's extreme deference to the Commission, notably urged by EPCOR and the intervening districts, is but the latest in a problematic trend originating with oft-repeated dicta in *Tucson Gas*: "While it is not so named," the Commission is "in fact, another department of government," and "[i]ts exclusive field may not be invaded by either the courts, the legislative, or executive." 15 Ariz. at 306. In that case, the legislature had passed a law prohibiting utilities from charging for more than the actual amount of resources furnished to the consumer. *Id.* at 296. Notwithstanding this law, a utility attempted to collect a minimum rate from its customers. *Id.* The question before the court was whether the legislative act was unconstitutional. *Id.* The two-justice majority held that the legislature had attempted to "fix rates," a power that lay solely with the Commission, and thus the statute could not stand. *Id.* at 301, 307–08.

¶41        *Tucson Gas* takes a dim view of the judiciary's role in reviewing Commission decisions. To reach its holding, the supreme court noted "[t]he unwisdom and impracticability of imposing upon the courts, in the first instance, this kind of litigation." *Id.* at 305. This led the court to conclude that Arizona's founders "knew the evil, and sought to correct it in the fundamental law of the state by constituting the Corporation Commission a body empowered . . . to exercise not only legislative but the

judicial, administrative, and executive functions of the government. . . . Its *exclusive field may not be invaded by either the courts*, the legislative, or the executive." *Id.* at 306 (emphasis added). This or similar language has been recycled often in framing the standard for reviewing the Commission's decisions. *See, e.g.*, *RUCO*, 240 Ariz. at 111, ¶ 12; *Ariz. Corp. Comm'n v. State ex rel. Woods*, 171 Ariz. 286, 292 (1992); *Consol. Water Utils., Ltd. v. Ariz. Corp. Comm'n*, 178 Ariz. 478, 483 (App. 1993); *Sw. Gas Corp. v. Ariz. Corp. Comm'n*, 169 Ariz. 279, 283 (App. 1991); *supra* ¶ 13. Applied literally, it leaves no role for the courts to fill.

¶42 I cannot say whether the two justices in the *Tucson Gas* majority (only one of whom was a delegate to our state's constitutional convention) had the better claim to original intent than did the dissenting justice (also a delegate), but I would not quarrel with the notion of absolute deference to the Commission that *Tucson Gas* embraces if it were actually mandated by the text of our Constitution. But that is not the case.

¶43 Contrary to popular belief, the Commission is not, "in fact, another department of government." *See Tucson Gas*, 15 Ariz. at 306. As Article 3 of the Constitution plainly states, "[t]he powers of the government . . . *shall* be divided into *three* separate departments." Ariz. Const. art. 3 (emphasis added). Article 3 further states that unless the Constitution itself provides otherwise, no department may "exercise the powers properly belonging to either of the others." *Id.* So while the Constitution expressly gives the Commission the authority and responsibility to exercise various aspects of each of the three governmental powers, the Commission is still not an independent and coequal branch of government on equal footing with the legislative, executive, or judicial branches.

¶44 The Constitution's silence on this issue is a sufficient basis to conclude that the Commission is neither a fourth branch of government nor exempt from judicial review. But that silence is even more prominent given the conditions in which Arizona's government was founded. The framers of our Constitution, distrustful of concentrations of governmental power, explicitly dispersed that power among different institutions in our state's new government. John D. Leshy, *The Making of the Arizona Constitution*, 20 Ariz. St. L.J. 1, 70 (1988). They believed "that process and structure are key controls on the tendency to abuse power." *Id.* And despite their cardinal "concern with direct democracy," the framers "had no real reason to regard judicial review as antidemocratic" because of independent democratic safeguards on the judiciary. *Id.* at 75 (discussing, for example, the ease of amending the Constitution). Neither the legislature nor the executive branch is immune from judicial review, even though each is a coequal

branch with the judiciary. It is, after all, the function of the judiciary is to review the constitutionality of "the acts of other departments"—a proposition widely accepted at the time of statehood. *Id.* at 74. That being the case, why the courts have come to concede virtual autonomy to the Commission is a mystery.

¶45 Given the language of Article 3, had the framers wanted the Commission to be treated as a fourth branch of government virtually immune from judicial review (unlike the other branches), they would certainly have expressed such an extraordinary proposition in the text. But for some reason our courts have failed to consistently recognize that principle. Over 35 years ago, responding to the Commission's argument suggesting its decision was not subject to judicial review, this court explained that the Commission is not exempt from the "general principle that agency proceedings leading to rate decisions are . . . subject to judicial scrutiny and review relating to compliance with statutory requirements and constitutional due process standards." *State ex rel. Corbin v. Ariz. Corp. Comm'n*, 143 Ariz. 219, 224 (App. 1984). Though we acknowledged the Commission's "constitutional genesis," we found "no validity" in its assertion that the judiciary had no role to play. *See id.* at 224–25. Despite that finding, Arizona's appellate decisions continue to cite *Tucson Gas*'s broad dicta implying that judicial review of Commission decisions means we will affirm if there is any basis whatsoever for doing so.

¶46 As relevant here, the Commission's power is "to prescribe classifications, rates, charges, rules, regulations, or orders." *Tucson Gas*, 15 Ariz. at 307. Thus, in the realm of ratemaking, what *Tucson Gas* stands for is that neither the legislature nor the courts can set rates or charges. But it must still be the province and the duty of the courts to determine (once a rate is prescribed) whether it is just, reasonable, and not discriminatory.

¶47 Ultimately, there is ample room in the scheme of separation of powers for both the Commission and the courts to carry out our respective roles. It is the Commission, not the courts, that has the expertise required to develop the complex set of facts necessary to perform its constitutional function and, ultimately, to articulate how those facts support its ultimate decision. *See Marco Crane & Rigging v. Ariz. Corp. Comm'n*, 155 Ariz. 292, 294 (App. 1987); *Campbell v. Mountain States Tel. & Tel. Co.*, 120 Ariz. 426, 431–32 (App. 1978). Indeed, it would be the height of judicial pride to conclude otherwise because, unlike the Commission, we have neither political constituencies nor any special expertise in, what our framers themselves called, "the most complicated subject in the economic world." *The Records of the Arizona Constitutional Convention of 1910*, 979 (John

S. Goff ed., 1991); *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989) (noting deference should be at its height when a high level of technical experience is required to resolve the issue); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984) ("Judges are not experts in the field, and are not part of the political branches of Government.").

¶48 But judicial review is meaningless if reviewing courts merely "rubberstamp" Commission decisions without ensuring the Commission complied with, or at least demonstrated its awareness of, its constitutional and statutory obligations. *See NLRB v. Brown*, 380 U.S. 278, 291–92 (1965); *see also Pub. Citizen Health Research Grp. v. Tyson*, 796 F.2d 1479, 1505 (D.C. Cir. 1986) (explaining that a reviewing court owes no deference "when the agency simply has not exercised its expertise"); *cf. Gaveck v. Ariz. State Bd. of Podiatry Exam'rs*, 222 Ariz. 433, 438, ¶ 18 (App. 2009) ("Without clearly articulated standards as a backdrop against which the court can review discipline, the judicial function is reduced to serving as a rubber-stamp for the Board's action." (citation omitted)). Although we do not "decide matters entrusted to other branches," we remain obliged to "determine respective constitutional boundaries." *State v. Maestas*, 244 Ariz. 9, 15, ¶ 28 (2018) (Bolick, J., concurring); *see Forty-Seventh Legislature of State v. Napolitano*, 213 Ariz. 482, 485, ¶ 8 (2006) ("[D]etermin[ing] whether a branch of state government has exceeded the powers granted by the Arizona Constitution . . . traditionally falls to the courts to resolve."). That the Commission is a powerful and centralized government agency with authority over necessities of life like water, wastewater, and electricity only makes it more imperative that we carry out this duty when reviewing Commission decisions. *See Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1155 (10th Cir. 2016) (Gorsuch, J., concurring).

¶49 The proper exercise of our judicial function respects the Commission's expertise by ensuring the Commission has, in fact, exercised that expertise. Our review must remain probing enough to require that the Commission clearly articulates logical reasons for its decisions. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983); *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 792 (1968) (explaining that the court's responsibility was to assure itself that the Federal Power Commission gave "reasoned consideration to each of the pertinent factors. Judicial review of the Commission's orders will therefore function . . . only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act . . . ."). When we do so it ensures that the Commission remains accountable to the voting public whose votes, in Arizona at least, ultimately decide the course the Commission will take. *See* Ariz. Const. art. 15, § 1; *see also* Eduardo Jordão & Susan Rose-

Ackerman, *Judicial Review of Executive Policymaking in Advanced Democracies: Beyond Rights Review*, 66 Admin. L. Rev. 1, 46 (2014). It is critical, therefore, that the Commission explain the reasons for its decisions so that the voters—who share the benefits or burdens of those decisions—can make informed decisions at the ballot box. If our review fails to ensure that the Commission provide an adequate answer to fairly presented arguments of constitutional magnitude, then we undermine the people's ability to carry out their critical function within our constitutional framework. *See Ariz. Corp. Comm'n v. State ex rel. Woods*, 171 Ariz. 286, 297 n.9 (1992) ("Under Arizona's system . . . the remedy for regulatory abuse is election.").

**¶50**     Resolving claims of discriminatory ratemaking under the anti-discrimination clause and § 40-334 is, in no small way, the proper way for the courts and the Commission to carry out our respective roles. Whether discrimination has occurred is ultimately a legal question, but answering that question undoubtedly depends heavily on the complex set of facts underlying ratemaking. In this context, it is the Commission, not this court, that is expert at developing those facts, articulating a rational connection between those facts and its chosen policy, and ultimately, as relevant here, offering a reasoned justification as to why its decision does not violate the prohibitions of our Constitution and statutes. Only when the Commission has brought its expertise to bear on the issue can we properly carry out our duty to review whether consolidation violates the anti-discrimination clause or § 403-34. That is the only way we can ascertain whether the Commission has exceeded constitutional and statutory boundaries by imposing a discriminatory charge. And it is no answer to say that the Commission's lack of analysis is irrelevant because our review is de novo anyway. We are not empowered to make decisions in the first instance. De novo review is just that, *review*.

**¶51**     This case presents an ideal opportunity, then, for our supreme court to clarify that Commission decisions are not untouchable by the judiciary. They are subject to judicial review as contemplated by the Constitution and statutes that outline the process aggrieved parties may follow in challenging a Commission order. And if the standards for evaluating a discrimination claim under Article 15, § 12, or § 40-334 are different than they are in other areas of the law, I urge the supreme court to announce and explain such standards.

**¶52**     In sum, we should not be so willing to defer to the Commission that we create answers to arguments it never addressed in the first instance, simply because it wears different constitutional hats. The word "discrimination" or "discriminatory" does not even appear in the

Commission's findings of fact and conclusions of law; nor is there any reference to the relevant statute or constitutional provision. Not only do we have the authority to remand under these circumstances, it is our obligation to do so. When the Commission fails to meaningfully address a constitutional challenge to its proposed plan of action, and thereby ignores its duty to exercise its limited judicial power, traditional separation of powers principles require remanding so the Commission may address the constitutional challenge.

### B.      Rate Discrimination

¶53      Putting aside my disagreement with the deferential posture applied by the majority, under even that extremely generous standard of review, I would remand this case based on the Commission's failure to address SCHOA's claim that the consolidated rate structure violates the constitutional and statutory prohibitions against discrimination.

¶54      The Commission's failure to consider the prospect of discrimination may be due to the originality of SCHOA's claim. The Commission and the majority seem to understand SCHOA to argue that a consolidated rate discriminates against them because they receive different "services" within the meaning of the anti-discrimination clause and § 40-334. *Supra* ¶¶ 19–23. I read it differently. It seems clear to me that SCHOA has been saying all along that a uniform *charge* for wastewater is unconstitutionally discriminatory because it costs so much less for EPCOR to provide SCHOA's residents with the "like and contemporaneous service" it provides the other districts—wastewater treatment.[7]

¶55      SCHOA therefore argues that not only did the Commission fail to adequately explain why it rejected SCHOA's evidence and arguments about discrimination, but it appears the Commission failed to even consider the possibility that a uniform rate was discriminatory. And, as SCHOA emphasizes, the Commission's decision represents an abrupt and substantial departure from its own precedent. Unlike the majority, I believe SCHOA has clearly and convincingly demonstrated that the Commission's decision is "arbitrary, unlawful or unsupported by

---

[7]      For example, the opening brief states that "[r]ate discrimination thus arises when (1) a utility imposes a single, uniform rate on consumers in separate communities notwithstanding vast differences in the utility's cost to serve those communities," and (2) "[w]hen a firm sells the same service at rates which are not proportional to costs, discrimination results."

substantial evidence." *Litchfield Park Serv. Co. v. Ariz. Corp. Comm'n*, 178 Ariz. 431, 434 (App. 1994).

**¶56** A Commission decision is supported by substantial evidence when it contains "evidence which would permit a reasonable person to reach the Commission's result." *Sierra Club*, 237 Ariz. 568, 575, ¶ 22; *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 481 (1951) (noting a reviewing court cannot just "read only one side of the case and, if they find any evidence there, [conclude] the administrative action is to be sustained and the record to the contrary is to be ignored"). Even if substantial evidence supports the Commission's choice, it "may in another regard be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'—for example, because it is an abrupt and unexplained departure from agency precedent." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984). Decisions should also be set aside as arbitrary when they "fail[] to consider an important aspect of the problem" or to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" *State Farm*, 463 U.S. at 43 (citation omitted).

**¶57** This standard, undoubtedly, does not demand "*further justification . . . by the mere fact of policy change*" from the Commission, but it does demand "a *reasoned explanation . . .* for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Studios*, 556 U.S. 502, 515–16 (2009) (emphasis added). Importantly, we may not supply that explanation when the Commission has not. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016). Among other things, our attempt to do so would itself violate the separation of powers. *See* Ariz. Const. art. 3; *Chenery Corp.*, 332 U.S. at 196. As the United States Supreme Court explained long ago:

> If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong."

*Chenery Corp.*, 332 U.S. at 196–97 (citation omitted). As noted, the Commission has an essential constitutional role to play. And when we resolve issues the Commission should have addressed in the first instance,

21

we intrude on its constitutionally assigned ratemaking role. Ariz. Const. art. 15, § 3.

¶58 I emphasize these points not because the majority disagrees with them, but because reasonable application of these principles compels the conclusion that when the Commission decided to abandon long-favored cost-causation principles in favor of consolidation—and became aware that such consolidation could trigger discrimination in violation of both our statutes and Constitution—it was required to provide reasons for the change that are legally defensible and supported by evidence. *See Freeport Minerals Corp. v. Ariz. Corp. Comm'n*, 244 Ariz. 409, 414–17, ¶¶ 20–33 (App. 2018) (recognizing that (1) avoiding "rate shock" may permit the Commission to "deviate from strict cost of service" but that "does not mean that the instant rate allocation necessarily passes constitutional muster;" and (2) evaluating the record to determine if this was "sufficient justification").

¶59 Despite various warning signs that a consolidated rate might be discriminatory, the Commission never made any finding or offered any explanation that consolidating the five districts in a way that will compel SCHOA to subsidize the other four districts is not unconstitutional discrimination or does not violate A.R.S. § 40-334(A). The Commission glossed over facts that seem to fall within the prohibitions of both our Constitution and statutes, for example, citing "the fact that only Sun City customers would provide any subsidies" to other EPCOR districts as a great boon in favor of consolidation, seemingly suggesting that SCHOA's customers should feel elated that they are the only ones who will have to pay a portion of the sewer bills for customers in the other districts.[8]

¶60 Perhaps the most troubling aspect of this case, though, is that the Commission seemed to go out of its way to make clear it did not intend to provide an explanation as to why a consolidated rate was not discriminatory. In addressing the arguments concerning cost-causation, the Commission relied heavily on the EPA/NARUC study. That study employed the Bonbright Eight-Criteria standard, which includes

---

[8] Notably, the Sun City district has substantially more customers than any of the other four districts: Agua Fria serves 6,829 customers; Anthem serves 9,025 customers; Mohave serves 1,511 customers; Sun City West serves 17,450 customers; and Sun City serves 31,570 customers. And unique among the five districts is that Sun City's wastewater is treated at the City of Tolleson Wastewater Treatment Plant, which EPCOR neither owns, operates, nor controls.

"[a]voidance of 'undue discrimination' in rate relationships." Although this study concluded that a single-tariff approach was "generally consistent" with some of the Bonbright factors, the Commission expressly declined to reach any conclusion about whether a single-tariff approach was discriminatory and simply stated that "regulators have more room for discretion as to fairness, discrimination, and efficiency."

¶61        In Arizona, however, our Constitution states there shall be "no discrimination"; it does not give regulators permission to discriminate so long as they do not abuse their discretion. Ariz. Const. art. 15, § 12. As a constitutional and statutory directive, the question of discrimination was surely "an important aspect of the problem" the Commission was required to resolve. *See State Farm*, 463 U.S. at 4; *see Earth Island Inst. v. Hogarth*, 494 F.3d 757, 760–61 (9th Cir. 2007) (recognizing that an agency action that fails to comply with "Congressional mandates" is arbitrary). Given the Commission's finding that Sun City alone would subsidize the other EPCOR districts, which on its face implicates some type of discrimination, the need to resolve whether that discrimination violates Arizona law seems especially pressing. Although the onus was on the Commission to explain why such subsidization was not unlawful, it plainly chose to ignore the issue. That alone renders the Decision arbitrary.

¶62        Charitably construed, the Decision could be read to say that the consolidated rate *is* discrimination but that it is justified on the grounds that "simply comparing utility rates in neighboring areas . . . is not by itself typically a valid basis for assessing whether rates for a company are just and reasonable because a host of factors can influence rate disparity between and among individual companies and municipal utilities." If that were true, then no one could doubt that, given the mandates of our Constitution and statutes, we would be required to apply some tier of scrutiny to the Decision. The point, however, is that we should not have to guess. The Commission should have at least explained what those "factors" were, why they applied in this case to make the newly consolidated rate structure legally permissible, and what legal standard it used to reach its conclusion.[9] Only then can we fulfill our proper role to ensure that the Commission has not contravened constitutional or statutory boundaries.

---

[9]        SCHOA argues that as a right guaranteed by the Arizona Constitution, rate discrimination should receive strict scrutiny review. Yet the Decision does not address this contention, nor the applicable standard of review. The Commission should have, at the least, stated how it

**¶63** Although the Commission may have indicated that it considered cost evidence, it never explained how abandoning costs did not create discrimination. The five reasons the Commission offered on pages 201–206 of the Decision do nothing to change this conclusion. Of these, only the first and last reasons cited by the majority, *supra* ¶ 26, implicate in any way the discrimination question, but they still offer no rational connection between the facts found and the choices made. For example, the Commission explained it was abandoning "traditional cost-causation ratemaking, as applied to date" but that did not matter because it will follow cost-causation principles after consolidation, viewing the districts as one whole. This "model of circular reasoning, in which the premises of the argument feed on the conclusion," does nothing to explain why the consolidation itself—which compels Sun City residents to subsidize other EPCOR customers—does not create illegal discrimination, and as such cannot pass muster. *See Wesberry v. Sanders*, 376 U.S. 1, 25 (1964) (Harlan, J., dissenting); *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1515–16 (D.C. Cir. 1984) (reasoning that a FERC decision was deficient for an "absence of evidence and explanation" when the "proposed rate design result[ed] in a cross-subsidization" and FERC offered only circular reasoning to deny the existence of rate discrimination); *see also Maher Terminals, LLC v. Fed. Mar. Comm'n*, 816 F.3d 888, 890–91 (D.C. Cir. 2016) (reasoning that the commission's order approving a disparity in rental rates offered an inadequate explanation because, among other things, it relied on circular reasoning).

**¶64** A concerning theme of the Decision is the Commission's apparent acceptance of Verrado's claim that stand-alone rates would be unconstitutional because "price discrimination" would continue to exist

---

addressed SCHOA's constitutional arguments—what is being compared and analyzed. The majority seems to conclude that no constitutional injury sufficient to trigger any form of scrutiny occurred merely because the Commission said so. I know of no area of constitutional law where we determine whether an injury has occurred by simply deferring to the decision of the body we are reviewing, especially when that decision is silent on the matter. At any rate, the majority's premise is inaccurate—even if we find no "substantial burden" of a fundamental right, then the law or decision at issue remains subject to review, albeit under a lower level of scrutiny.

amongst the five districts.[10]  To the extent discrimination was occurring before consolidation, it was not created by SCHOA.  Before EPCOR acquired SCHOA, it could not be said that SCHOA's lower costs created any discrimination between it and the other districts involved in this case.  According to the Commission's logic, however, the day after EPCOR acquired SCHOA an immediate discrimination problem arose because the other districts' less efficient systems caused their customers to have to pay higher rates.[11]  The majority also appears to embrace this logic, which essentially means that going forward a single tariff must be used for all multi-district public service corporations because to find otherwise would be discriminatory.  This approach ignores the obvious fact that until EPCOR decided it would be profitable to acquire the wastewater rights of these districts, nothing about their differing rate structures was discriminatory.  The only thing that changed was ownership of the districts.  I cannot believe the framers of our Constitution contemplated that the anti-discrimination clause could be used as a sword here to compel consolidation under the guise of eliminating discrimination.  Similarly, I see nothing in § 40-334 suggesting that the legislature intended to require that outcome.

¶65        Consolidation is not like typical ratemaking.  The obvious potential for discrimination exists when dissimilar districts are consolidated.  It is therefore plain that the Commission must consider any discriminatory impact *before* consolidation.  Such caution is warranted here, because this decision will undoubtedly set precedent for future consolidation cases.  And if today's holding is any barometer, such consolidation will occur without regard to where the districts are located, what their customers have paid in the past, what sacrifices they may have made to build and maintain a different (and arguably more efficient) system, or whether better management has allowed them to keep their unique, and perhaps less costly, systems.  Moreover, forced consolidation

---

[10]    The Commission, apparently making this implicit finding without any constitutional or statutory analysis, somehow believed it was appropriate to reach that determination and yet failed to address the alleged discrimination asserted by SCHOA.

[11]    Other entities that own multiple water or wastewater treatment systems in Arizona with different customer rates for each system will likely be surprised to discover that, according to the Commission's implicit reasoning in this case, they are now violating the anti-discrimination provisions at issue here.  Of course, if the entities are in favor of consolidation, then this case will presumably make it easier for them to win Commission approval to do so.

may occur even though the majority of customers in a particular district might like to avoid dealing with a larger administrative bureaucracy.

¶66 The Commission states—and the majority appears to accept—that it "generally believes that consolidating smaller utilities into larger utilities is beneficial to the smaller utilities and their customers, and that principle should apply equally in the context of consolidating distinct geographically defined utility districts into a unified district." If consolidation is discriminatory, however, that would present an obstacle to the Commission's new policy. The Commission's vague "belief" of what is good for consumers generally, as a matter of policy, is no answer to the question of whether rates discriminate against a group of ratepayers specifically.

¶67 Likewise, the evidence relied on in ¶ 22 of the majority opinion does not address SCHOA's claim that, again, is grounded in the assumption that the districts receive like and contemporaneous services. The Commission's finding that "[t]here is not an appreciable difference in the wastewater *service* received by customers located in different EPCOR wastewater districts" completely misses the mark. (Emphasis added.) It has no bearing on SCHOA's claim of discriminatory *charges*. The only cited evidence that addresses whether consolidation would impose a discriminatory charge on Sun City customers is the testimony of Shawn Bradford, EPCOR's vice president of corporate services, who generally opined that costs would be fairly consistent throughout the five districts. But Bradford could not say whether this was true of Sun City because EPCOR has no control over costs at the Tolleson plant, where Sun City's wastewater is treated. Thus, his statement that he "would think that the operating costs to treat the effluent . . . is roughly the same" rested, by his own admission, on sheer speculation. I do not agree that purely speculative testimony of one witness is "evidence which would permit a reasonable person to reach the Commission's result." *See Sierra Club—Grand Canyon Chapter*, 237 Ariz. at 575, ¶ 22; *City of Tucson v. Citizens Utils. Water Co.*, 17 Ariz. App. 477, 481 (1972) ("Mere speculation and arbitrary conclusions are not substantial evidence and cannot be determinative.").

¶68 The failure of the Commission to provide a reasoned resolution of SCHOA's discrimination claim, and the majority's labored effort to uphold its decision despite that absence, is perhaps the best evidence of why we should not opine on such issues without the benefit of a reasoned explanation by the Commission—here, the majority's holding saps the anti-discrimination clause, as well as § 40-334, of virtually all meaning. In short, we should not have to guess as to such explanation.

¶69        Existing caselaw in this area is quite sparse, with almost no cases construing the two anti-discrimination provisions. In *Town of Wickenburg v. Sabin*, 68 Ariz. 75, 77 (1948), however, our supreme court stated that "the law on discrimination as applied to public service corporations generally is well settled." The court explained how a public service corporation can avoid acting in a discriminatory manner:

> The charges must be equal to all for the same service under like circumstances. A public service corporation is impressed with the obligation of furnishing its service to each patron at the same price it makes to every other patron for the same or substantially the same or similar service. . . . The common law upon the subject is founded on public policy which requires one engaged in a public calling to charge a reasonable and uniform price to all persons for the same service rendered under the same circumstances.

*Id.* at 77–78 (quoting 4 Eugene McQuillin, Municipal Corporations § 1829 (2d ed. 1943)). Relying on *Wickenburg*, this court has further described the non-discrimination doctrine as the "obligation of a public service corporation to provide impartial services and rates to all its customers similarly situated." *Miller v. Salt River Valley Water Users' Ass'n*, 11 Ariz. App. 256, 260 (1970). Neither *Wickenburg* nor *Miller*, however, relied on the Arizona Constitution or § 40-334 because neither involved a public service corporation and thus provide little guidance on construing these anti-discrimination provisions. *See Miller*, 11 Ariz. App. at 260 (noting the provision while passing over the defendant's argument).

¶70        As stated above, *supra* ¶ 54, SCHOA raises an atypical discrimination claim. It argues the charge imposed creates disparate rates of return among the five districts and that, of these, Sun City alone is prejudiced. Despite the majority's skepticism of such a claim, other courts in similar contexts agree that such a rate structure is discriminatory. *E.g.*, *Cities of Riverside & Colton v. FERC*, 765 F.2d 1434, 1439 (9th Cir. 1985); *Ala. Elec. Co-op., Inc. v. FERC*, 684 F.2d 20, 28 (D.C. Cir. 1982); *Glacier State Tele. Co. v. Alaska Pub. Utils. Comm'n*, 724 P.2d 1187, 1191 (Alaska 1986). And SCHOA's claim tracks the plain language of both anti-discrimination provisions. *See* Ariz. Const. art. 15, § 12 (forbidding public service corporations from imposing discriminatory charges as between "persons or places" to which it provides "a like and contemporaneous service"); § 40-334 (providing that a public service corporation may not "make or grant any preference or advantage to any person or subject any person to

any prejudice or disadvantage" relating to the corporation's "rates, charges, services, facilities or in any other respect").

¶71    Today, however, absent intervention by our supreme court, the majority permanently shuts the door on any similar constitutional argument whenever the Commission concludes that a utility's customers receive "like and contemporaneous service," even though there is substantial evidence to the contrary.  This is so because, according to the majority, "where customers receive 'like and contemporaneous service,' rate parity is not only encouraged, but constitutionally required." *Supra* ¶ 19.  Again, SCHOA is not contending that the difference in the costs to treat its wastewater means it receives a different "service" within the meaning of the anti-discrimination clause; rather, it asserts that EPCOR imposes a discriminatory charge for rendering that service.  Moreover, the majority's apparent conclusions—that this court can find a violation of the anti-discrimination clause only when customers do not receive similar service and that we must defer to the Commission's evaluation of such service—are at odds with the text and purpose of our Constitution.

¶72    The anti-discrimination clause prevents utilities from "discriminat[ing] in charges . . . between persons or places for rendering a like and contemporaneous service." Ariz. Const. art. 15, § 12.  Our obligation is to consider "the plain meaning of the words as enacted." *Ariz. Dep't of Revenue v. Dougherty*, 200 Ariz. 515, 518, ¶ 9 (2001).  As relevant here, the clause plainly covers a scenario where a utility makes a demand, *Charge* Black's Law Dictionary (4th ed. 1954), on one group of customers, in connection with treating their wastewater, *see Service* Black's Law Dictionary (4th ed. 1954) ("[t]he furnishing of water, heat, light and power, etc."), that is unfair when compared to the demands it places on other customers, *Discrimination* Black's Law Dictionary (4th ed. 1954).  It is difficult to imagine what could make a charge discriminatory in violation of this section, if EPCOR's plan to force its Sun City customers to subsidize the other districts does not meet that description.  Indeed, taken to its endpoint, the majority's reading of the anti-discrimination clause declares that courts, experts, and the Commission itself have been wrong all along about ratemaking in Arizona:  Consideration of costs is irrelevant because, regardless of costs, the anti-discrimination clause evidently mandates that all consumers pay the same amount to the penny.

¶73    Concluding that the Commission can side-step a more searching judicial review by making a factual finding to which we must defer, moreover, conflicts with the purpose of the anti-discrimination clause.  I readily acknowledge that our Constitution gives the Commission

vast powers to decide issues relevant to its core function. But why is the anti-discrimination clause in our Constitution, if not to provide a judicial backstop for when that core function breaks down? The provision is designed to prevent discrimination and cannot be brushed aside merely because the Commission found there were facts supporting consolidation.

¶74         Although I conclude the majority's constitutional analysis is wrong, I will refrain from commenting more about the meaning of the Constitution in the absence of a reasoned decision from the Commission. Instead, I would follow the lead of *Alabama Electric*, where the court remanded for a determination of whether a single rate design created undue (and therefore unlawful) discrimination. *Ala. Elec. Co-op., Inc.*, 684 F.2d at 29. The court explained that discriminatory treatment may be found even if "the affected customer groups may be in most respects similarly situated," i.e., they receive similar services, because so long as the "costs of providing [the similar] service to one group are different from the costs of serving the other, the two groups are in one important respect quite dissimilar." *Id*. at 27.

¶75         We should follow a similar approach here. We are faced with a groundbreaking policy change—adoption of the single-tariff rate design, the effects of which may be discriminatory if the districts are not similarly situated. It is the Commission's role to make the first run at explaining why its rate structure does not violate the anti-discrimination clause and § 40-334. Thus, this matter should be remanded to the Commission for a determination whether its consolidation resolution violates the Arizona Constitution's ban on discriminatory charges or § 40-334's mandate that no public service corporation may "subject any person to any prejudice or disadvantage," relating to its "rates, charges, services, facilities or in any other respect."

¶76         For these reasons, I respectfully dissent.



AMY M. WOOD • Clerk of the Court
FILED: AA